**UNITED STATES of America, Plaintiff/Appellee,**

**v.**

**Arthur Andrew ALLEN, Defendant/Appellant.**

**No. 84–4360.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 3, 1985.

Decided Nov. 9, 1987.

Ken Bauman, AUSA, Portland, Or., for plaintiff/appellee.

Hoffman, Matasar & Glaeser, Lawerence Matasar, Portland, Or., for defendant/appellant.

Before FLETCHER and BOOCHEVER, Circuit Judges, and AGUILAR,* District Judge.

AGUILAR, District Judge:

The defense of this marijuana smuggling case illuminates the serious constitutional and ethical problems facing lawyers who represent multiple co-defendants, or who orchestrate a joint defense or plea negotia-

* Honorable Robert P. Aguilar, United States District Judge, Northern District of California, sitting by designation.

tion among several co-conspirators.[1] The Boston criminal defense firm of Oteri & Weinberg spearheaded the defense of the seventeen co-defendants here.[2] The issue on this appeal is whether petitioner Arthur Allen was denied effective assistance of counsel due to unwaived conflicts of interest inherent in Oteri & Weinberg's simultaneous representation of Allen, his co-defendant and boss Charles Minnig, and the unindicted "generals" of the smuggling operation. We conclude that although Oteri & ·Weinberg's pre-trial representation of Allen bordered on a failure to comply with sixth amendment requirements, Allen was not denied effective assistance of counsel at trial and sentencing.

## FACTS

In 1976 and 1977, Allen traveled to Europe several times on behalf of his childhood friend, Timothy Minnig. On these trips he deposited large sums of cash in a Swiss bank and arranged for the transfer of money for the purchase of a freighter that would ultimately be used to smuggle marijuana. In mid–1977, Allen located and purchased a beachfront ranch on the southern Oregon coast to be used for the operation. He had been instructed to purchase the property and was provided the money to do so by Timothy Minnig.

Law enforcement agents raided the freighter and the ranch as the smuggling operation was underway, ultimately arresting seventeen persons including Allen. Although the government originally thought Allen was one of the three principals of the operation, it now concedes that Allen primarily acted as a "caretaker" of the ranch and took his orders from co-defendant

---

1. The proposition that "a possible conflict [of interest] inheres in almost every instance of multiple representation" scarcely requires elaboration. *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980).

During the pendency of this litigation Disciplinary Rule 5–105 of the American Bar Association's *"Model Code of Professional Responsibility "* provided:

(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).

(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).

(C) In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

(D) If a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner, or associate, or any other lawyer affiliated with him or his firm, may accept or continue such employment.

The local court rules of the three federal districts involved placed similar restrictions on multiple representation. *See* N.D.Cal.L.R. 3 (1983), incorporating Rules of Professional Conduct of the State Bar of California, Rule 5–102 (1975); D.Ore.L.R. 110–3 (1983), incorporating State of Oregon, Code of Professional Responsibility, D.R. 5–105 (1980); W.D.Wash.L.R. 2(e)(1) (1984), incorporating State of Washington, Code of Professional Responsibility, D.R. 5–105 (1978).

Some commentators have advocated judicial creation of a prophylactic rule completely barring multiple representation in all criminal cases. *See* Geer, *Representation of Multiple Criminal Defendants: Conflicts of Interest and the Professional Responsibilities of the Defense Attorney,* 62 Minn.L.Rev. 119, 157–58 (1978); Lowenthal, *Joint Representation in Criminal Cases: A Critical Appraisal,* 64 Va.L.Rev. 939, 983–88 (1978). *But see* Margolin & Coliver, *Pretrial Disqualification of Criminal Defense Counsel* 20 Am.J.Crim.L. 227 (1982).

2. Oteri & Weinberg is no stranger to the perils of joint representation. *See United States v. Donahue,* 560 F.2d 1039 (1st Cir.1977) (conviction reversed where Oteri & Weinberg represented co-defendants and did not adequately inform them of conflicts); *United States v. Martorano,* 457 F.Supp. 803 (D.Mass.1978), *rev'd* 610 F.2d 36, 41 n. 3 (1st Cir.1979) (Oteri & Weinberg's failure to explain risks of joint representation fell below professional standards), *vac'd* 620 F.2d 912 (1st Cir.) (*en banc* ) *cert. denied* 449 U.S. 952, 101 S.Ct. 356, 66 L.Ed.2d 216 (1980) (although trial court failed to inquire and waiver letter from Oteri & Weinberg inadequate, prejudice not likely).

Charles Minnig, the brother of Timothy Minnig.

The defendants had been instructed before the operation to contact Oteri & Weinberg should they be caught. Oteri & Weinberg was notified of the arrests, and attorney James Lawson of the firm immediately flew to Oregon to counsel the defendants. Lawson told the group not to talk to anyone, and that "[y]our friends are taking care of you [and] will be providing for you." Joseph Oteri and Martin Weinberg have since testified that they had an ongoing attorney-client relationship with the two men who subsequently would be indicted as the generals of the smuggling operation: Timothy Minnig and Robert Frappier. Indeed, Oteri was a "social friend" of Timothy Minnig. Unidentified persons delivered large sums of cash to the offices of Oteri &

Weinberg which funds were used to defend the seventeen defendants.[3]

At the defendants' preliminary appearances and arraignment before Magistrate George Juba in January and March of 1978, all seventeen men were represented by the firm of Oteri & Weinberg, and Norman Sepenuk, an Oregon attorney retained and paid by Oteri & Weinberg to serve as local counsel.[4] Magistrate Juba was aware of the possible conflicts arising out of the joint representation, and engaged counsel and defendants in lengthy colloquies.[5] Oteri and Weinberg told the Magistrate and the defendants, and have testified in the instant proceedings, that the only potential conflict they foresaw in the pretrial stage was if one or more defendants decided to cooperate with the government. The attorneys did not mention to the defendants or

3. Petitioner suggests that Oteri & Weinberg's relationship with Timothy Minnig and Robert Frappier follows the pattern described by Professor Alan M. Dershowitz:

[D]rug rings generally operate in a hierarchical structure with the boss at the top and the drug carriers—or "mules" as they are called—at the bottom. Naturally, it is the mules who take the greatest risk and who, in fact, are most often arrested. They generally do not have the funds to retain able lawyers. It is often part of the deal that if they are caught, the boss will provide lawyers for them. Providing these lawyers—who are often quite expensive—is hardly a demonstration of altruism on the part of the bosses. The bosses have an interest in assuring that their own lawyers—lawyers they are paying—are representing the mules. The last thing the boss wants is for an independent lawyer—or worse, a lawyer friendly to the prosecutors—to encourage the mules to buy their freedom in exchange for turning in the boss. Part of the mule's job is to be "stand-up guy"—to "take the heat and do his time" without informing on the boss.

The boss, in turn, has a stake in assuring his mules the best possible representation consistent with that understanding. A good lawyer will raise the odds that the mules will be acquitted, or if convicted, will get a light sentence. If the mules were to get long sentences, their incentive to sell out the boss would increase. Thus, a smart boss will generally try to retain the best possible lawyers for his mules. But he will try to get lawyers who will urge the mules to "fight rather than switch" allegiances.

\* \* \* \*

Certain kinds of "drug lawyers" invite this nightmare more than others. They represent

the same drug dealers on a continuing basis. They become the dealer's lawyer in much the same way that a Wall Street lawyer may become "house counsel" to a corporation (or the way a "consigliere" may become a legal advisor to an organized crime family). They give advice about ongoing transactions; their business cards and home phone numbers are given to the mules in the event of an arrest; they are "on call" any time a problem arises; they socialize and become friendly with the dealers. . . .

A. Dershowitz, *The Best Defense,* 398–400 (1982).

Dershowitz, who has defended members of the Oteri & Weinberg firm, goes on to suggest that prosecutors may harass vigorous defense lawyers:

The Oteri & Weinberg firm has, for example, been repeatedly subpoenaed, investigated, and audited. No wrongdoing has ever been found. But because they continue to represent marijuana and cocaine importers with great success, some prosecutors persist in treating them as if they were the defendants and their clients potential witnesses against them.

*Id.* at 400.

4. In addition to serving as local counsel for all defendants until the case was transferred to California in November of 1978, Sepenuk was paid a retainer of $25,000 by Oteri & Weinberg to represent individually defendant Charles Minnig. Sepenuk described Oteri & Weinberg as "lead counsel" who did most of the work. Sepenuk did not have significant individual contacts with Allen.

5. See *infra* note 13.

Magistrate the possibility of conflict arising from joint plea bargaining, or from the fact that Oteri & Weinberg at the same time had a relationship with Timothy Minnig and Robert Frappier. Indeed, Oteri and Weinberg believed they would not be able to mention the latter conflict without first having Minnig and Frappier waive their own attorney-client privileges.

Magistrate Juba found that Allen waived his right to separate counsel. None of the several judges who subsequently heard the case inquired about conflicts.

After the initial appearances before Magistrate Juba, Oteri and Weinberg procured identical written waivers[6] and declarations[7] from each defendant, including Allen. Moreover, they obtained separate, "independent" counsel for most of the defendants, and paid their retainers from the funds anonymously delivered on defendants' behalf.

In March 1978 Oteri subjected Allen to two polygraph tests in part to assure that he had not turned state's evidence. Oteri then arranged for Albert Cullen, a Boston attorney with offices down the hall from Oteri & Weinberg, to represent Allen. According to Weinberg, there was no contractual relationship between Oteri & Weinberg and Cullen. Cullen was paid $10,000 by a check drawn on Oteri & Weinberg's account. The check was made out to Charles Minnig, who endorsed it to Allen, who then endorsed it over to Cullen.

Even after the numerous defendants had their own "independent" attorneys appointed and paid by Oteri & Weinberg, Oteri, Weinberg, and Lawson continued to coordinate the proceedings. They perceived themselves, and were perceived by the other defense attorneys and the prosecution, as the "lead counsel" and "delegates" for the group. One of the defendants testified that Oteri and Weinberg "called the shots and ran the show." The probation officer thought they were "most definitely running the whole show." Indeed, this probation officer consulted only with Oteri and Weinberg, never with Cullen, regarding Allen's presentence report. Large joint meetings of the numerous defendants and attorneys were regularly conducted to strategize and resolve problems. According to Oteri himself, "we would like to act as consultants, have everybody get a separate attorney and we would do the legal work for everybody. We would act as consultants and in fact represent all of them without actually being there." Oteri told Allen that "I was kind of going to be a consultant, second counsel for all of them, and that was the agreement, that I would be there to consult with all of them or with their lawyers on any specific problems they had. So I consider myself having an attorney-client relationship with all seventeen defendants."

Oteri, Weinberg, and Lawson were primarily responsible for conducting the plea bargaining for all seventeen defendants. Oteri and Weinberg acknowledge that they counseled defendants to present a united front, believing that they could obtain a more favorable bargain for all the defendants if no one turned evidence against the others. Oteri testified that he "argued strenuously" for all the defendants to plead. They deny that this strategy was designed to protect the then-unindicted bosses of the ring.

By May 11, 1978, Oteri and Weinberg had discussed the government's evidence with the prosecutors and had devised a culpability list for purposes of plea bargaining. This ranking, entitled "Defendants' Requests For Sentences," listed each defendant and the sentence requested for that defendant. Allen was one of three defendants with the highest requested sentence: no more than two years, with six months to be served. Defendant Charles Minnig, who was Allen's boss in the smuggle, was listed for a sentence of no greater than one year, three months to be served. The lowest sentence was one year, thirty days to be served.

Oteri and Weinberg have testified in the instant proceedings that the rankings and

---

**6.** See *infra* note 14.

**7.** See *infra* note 15.

recommendations of the culpability list were based on what they believed the *government* knew at the time about each defendant. The list "was not intended to accurately reflect culpability." Indeed, before the list was distributed Oteri had "the perception" that Charles Minnig was Allen's boss. Similarly, Weinberg had "knowledge, conjecture, or suspicion" that Minnig was more culpable than Allen. Neither attorney conveyed this information to the government, and when asked why Minnig was not ranked above Allen, Weinberg responded: "I think that would have demonstrated to the government something that they didn't know, whereas otherwise the list was completely consistent with what they did know or what they informed me they knew." According to Weinberg, Charles Minnig was the government's "biggest question mark," and "[o]ne of our major strengths was the ignorance of the government as to the specific involvements ... amongst the seventeen people.... [To fill in the details] would not reduce Allen's six-month role, but might expand the scope of the numbers.... Mr. Allen's culpability might rise to ten years. Mr. Minnig's might have been 15 years."

Defense counsel never suggested to the prosecution or the judges that this culpability list was merely a restatement of the government's position. The probation officer testified that he assumed it was the defendants' own ranking, and that based on the list he believed that Allen had commanded the ranch operations. He so informed Judge Tanner.[8] The testimony also indicates that, whereas Minnig's full role was indeed a "question mark" for the government, the prosecution had informa-tion that Charles Minnig "ran the show", and was not completely satisfied that Arthur Allen was one of the bosses. Oteri and Weinberg resolved the prosecution's uncertainty in favor of Charles Minnig and against Arthur Allen.

Cullen was not present at the discussions between the prosecution and the defense camp's delegates. He necessarily relied on Oteri and Weinberg's characterizations of the government's evidence at the mass meetings and their resulting ranking proposals: It was "reported to me that ... the government felt that Arthur Allen was at the upper range because he had been out front.... And that's how the [requested sentence] came about to the best of my memory." Although he did not originate Allen's ranking, Cullen "thoroughly discussed" the ranking with Allen before the list was published. Cullen knew that Allen's relative culpability vis-a-vis Charles Minnig was inaccurately perceived by the government and misstated by the culpability list. Cullen suspected there were other organizers of the smuggling operation, but never discussed this at the time and was not informed about Timothy Minnig and Robert Frappier.

In July 1978 the defendants pleaded guilty before Judge Tanner. They put forward a high-ranking and a low-ranking defendant for sentencing to test the waters. Judge Tanner, who was familiar with the culpability list, sentenced the high-ranking defendant to four years, considerably more time than the defendants had requested. Allen's attorneys assumed that Allen would receive an equivalent sentence as he was ranked equivalently on the culpability list.

---

**8.** Probation officer George Minor drafted the presentence report for Judge Tanner. He testified:

Q. Did you rely on [the culpability list] in preparing your culpability prescription and sentencing recommendation to Judge Tanner?
A. In part, yes.
Q. What effect, if any, did that list have on your assessment of Mr. Allen's relative culpability?
A. It added more—it added credence to the—what was already suspected at the time, that Mr. Allen was probably, of the 17, one of the most, if not the most, culpable of the bunch.

Q. How would you describe what you believed his role to be ...?
A. ....He appeared to be a director, if not actual financier, a lieutenant in the operation and—quote unquote—on site boss at the ranch at the very minimum.
He seemed to be in charge of the whole operation of the ranch, at the Allen ranch.
Q. You assumed he had command authority over the operations of the ranch?
A. That's correct.
Q. Did you pass that assessment on to Judge Tanner?
A. Yes, I did.

The low-ranking defendant was sentenced to nine months. Allen and several of his co-defendants thereupon withdrew their guilty pleas.

Judge Tanner denied a joint motion to suppress, and set trial for November 1978. In exchange for a reduction of counts and preservation of an appeal, Allen and the remaining defendants agreed to a trial limited to certain issues before Judge Samuel Conti. The parties stipulated to certain of the facts. Allen still faced three counts, whereas his remaining co-defendants faced only one or two. Charles Minnig might also have faced three counts had he appeared for trial.

Oteri and Weinberg, as well as Cullen, continued to talk to the prosecution on behalf of Allen. Oteri and Weinberg attempted to persuade the prosecutor to reduce the number of counts facing Allen, but appealed to sympathy rather than provided the facts of relative culpability. The government was not receptive. At no point did Cullen provide any additional factual information to the government.

As the partial stipulated facts trial before Judge Conti approached, Oteri and Weinberg retained San Francisco attorney Mark Topel to "minimize the damage to Allen." Topel was thought to have some rapport with Judge Conti, and Allen faced the worst prospects at trial due to his perceived role in the smuggling operation. It appears that Topel rather than Cullen took the lead role at trial and that Topel alone represented Allen at sentencing. Topel had no contact with Oteri, Weinberg, or Allen before January 1979. He was unaware of the culpability list and of Oteri & Weinberg's unindicted clients, although "it was apparent" that there were unindicted people involved. Before trial Topel told the prosecution that Allen was just a front man, and asked without success for a reduction of counts. Topel endeavored to convince Judge Conti at sentencing that Allen was not as culpable as appeared.

On January 26, 1979, Allen was convicted on three counts: conspiracy to possess marijuana with intent to distribute, conspir-

acy to import marijuana, and possession with intent to distribute approximately 17,-837 pounds of marijuana. There is no indication that Judge Conti was aware of the culpability list. Judge Conti sentenced Allen on two of the three counts, to an indeterminate prison term of ten years. We affirmed the conviction in *United States v. Allen*, 675 F.2d 1373 (9th Cir.1980).

### THE § 2255 PETITION

In 1981 defendant filed his amended 28 U.S.C. § 2255 petition to vacate, set aside, or correct the sentence on the ground that he was denied effective assistance of counsel. Allen alleged that his attorneys, who were retained and paid by third parties, endeavored to prevent him from disclosing the identity of the true bosses of the conspiracy and to protect certain other defendants. Pursuant to these objectives, his lawyers: 1) prevented him from cooperating with the government, 2) failed to correct the erroneous culpability assessment by defense counsel that inaccurately inflated his culpability and deflated that of co-defendant Charles Minnig, 3) insisted, upon implied threat of force, that he waive his right to a jury trial, to testify, and to confrontation, 4) suborned perjury, to his detriment, and 5) prevented him from talking to a probation officer for purposes of a presentence report. Allen claimed, in short, that he "took the fall" for co-defendant Charles Minnig and the two then-unindicted generals of the smuggling operation, Timothy Minnig and Robert Frappier.[9]

Magistrate Michael R. Hogan received considerable testimony from Allen, two of Allen's co-defendants, the prosecuting attorney, the probation officer, and the five lawyers who represented Allen. On May 13, 1983, the Magistrate entered his findings and recommended denial of the § 2255 petition. On September 24, 1984, Judge James M. Burns adopted and elaborated on these findings and denied the § 2255 motion.

On appeal, Allen argues that the district court failed to make a proper inquiry into

---

**9.** Petitioner has not pursued the third, fourth, or fifth claim on appeal.

the conflict of interest between Allen and his sixteen co-defendants who were effectively represented by the same counsel. He contends that the conflict was actual, that the conflict adversely affected the performance of his attorneys, and that he did not knowingly and intelligently waive his right to independent counsel. Allen makes a similar argument as to his conflict with Oteri & Weinberg's then-unindicted clients, Timothy Minnig and Robert Frappier.

## STANDARD OF REVIEW

In *United States v. McConney*, 728 F.2d 1195 (9th Cir.) (*en banc*), *cert. denied* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984), we described the three-step analysis undertaken by district courts for mixed questions of fact and law in constitutional cases.

> The first step is the establishment of the "basic, primary, or historical facts: facts 'in the sense of a recital of external events and the credibility of their narrators....'" The second step is the selection of the applicable rule of law. The third step—and the most troublesome for standard of review purposes—is the application of law to fact or, in other words, the determination "whether the rule of law as applied to the established facts is or is not violated."

*Id.* at 1200 (citations omitted). The scope of appellate review for the first determination is the deferential "clearly erroneous" standard. The second determination is reviewed *de novo*. *Id.* at 1200–01. The third determination is also reviewed *de novo*, unless the applicable legal standard provides for a "strictly factual test" or is a question of negligence. *Id.* at 1204; *United States v. Hicks*, 752 F.2d 379, 383 (9th Cir.1985).

## SIXTH AMENDMENT STANDARDS

Under the sixth amendment a criminal defendant has the right to be represented by counsel whose loyalties are undivided. *Wood v. Georgia*, 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981); *United States v. Partin*, 601 F.2d 1000, 1006 (9th Cir.1979), *cert. denied*, 446 U.S. 964, 100 S.Ct. 2939, 64 L.Ed.2d 822 (1980). Although joint representation is not *per se* violative of the sixth amendment's guarantee of effective assistance of counsel, *Holloway v. Arkansas*, 435 U.S. 475, 482, 98 S.Ct. 1173, 1177, 55 L.Ed.2d 426 (1978), "a possible conflict [of interest] inheres in almost every instance of multiple representation." *Culyer v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980). Conspiracy cases such as this one merit particular scrutiny.[10]

■ A court must "take adequate steps to ascertain whether the risk [of a conflict is] too remote to warrant separate counsel." *Holloway, supra*, 435 U.S. at 484, 98 S.Ct. at 1178. Trial courts presented with a possible conflict have an affirmative duty to protect a defendant's rights, *Glasser v. United States*, 315 U.S. 60, 72, 62 S.Ct. 457, 465, 86 L.Ed. 680 (1942), which duty arises when the possibility of conflict is "brought home to the court." *Holloway, supra*, 435 U.S. at 485, 98 S.Ct. at 1179 (quoting *Glasser, supra*, 315 U.S. at 76, 62 S.Ct. at 467). In every case of joint representation, if the court "knows or reasonably should know that a particular conflict exists" it must initiate an inquiry about that conflict. *Sullivan, supra*, 446 U.S. at 347, 100 S.Ct. at 1717. Of course, a defendant may waive his right to the assistance of an attorney who is unhindered by conflicts, *Holloway, supra*, 435 U.S. at 483 n. 5, 98 S.Ct. at 1178 n. 5, provided the waiver is given knowingly and intelligently. *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981).

■ Unconstitutional multiple representation "is never harmless error." *Sullivan, supra*, 446 U.S. at 349, 100 S.Ct. at

---

**10.** The *Glasser* Court reasoned:

In conspiracy cases, where the liberal rules of evidence and the wide latitude accorded the prosecution may, and sometimes do, operate unfairly against an individual defendant, it is especially important that he be given the benefit of the undivided assistance of his counsel without the court's becoming a party to encumbering that assistance.
*Glasser v. United States*, 315 U.S. 60, 76, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942).

1718. If a defendant fails to object to representation by an attorney with a conflict, but shows on appeal that "an actual conflict of interest adversely affected his lawyer's performance," reversal is required. *Id.* at 348, 100 S.Ct. at 1718; *United States v. Sutton,* 794 F.2d 1415, 1419 (9th Cir.1986). Counsel must have "actively represented conflicting interests," *Sullivan, supra* 446 U.S. at 350, 100 S.Ct. at 1719, and the conflict must have "actually affected the adequacy of his representation." *Id.* at 349, 100 S.Ct. at 1718. Although the conflict must be actual rather than potential or speculative, yet the defendant "need not demonstrate prejudice in order to obtain relief." *Id.* at 349–50, 100 S.Ct. at 1718–19; *Brown v. United States,* 665 F.2d 271, 272 (9th Cir.1982); *United States v. Hearst,* 638 F.2d 1190, 1194 (9th Cir.1980), *cert. denied,* 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981). These principles apply equally to pretrial plea negotiations and the sentencing process. *Holloway, supra,* at 489–90, 98 S.Ct. at 1181.

## DISCUSSION

The record is clear in at least two respects. Oteri and Weinberg were intimately involved in all facets of the representation of these seventeen defendants, from the initial consultations and bail reduction hearing up to the stipulated facts trial. They delivered the bail money, selected the attorneys and paid their retainers, designed the joint defense, prepared the motion papers, and managed the plea negotiations. Their energies and strategies permeated the proceedings, even while numerous other attorneys provided some individualized counsel to the defendants. By their own admissions they had attorney-client relationships not only with each of the seventeen defendants, including Allen, but with the unindicted bosses of the operation as well.

It is also evident that Oteri and Weinberg, by acting independently of Cullen and Topel, essentially controlled the range within which a plea bargain and negotiated sentence would be available to Allen. They conceived the culpability list and effectively determined Allen's rank on that list.

With these considerations in mind, we review *de novo* the district court's determinations that any conflicts of interest were either speculative or waived by Allen. We then consider the court's findings that Cullen and Topel provided genuinely independent counsel to Allen.

### The Trial Court's Duty of Inquiry

The nature of this case and the sheer number of co-defendants "brought home" to the district court the possibility of conflicts of interest. As noted, Magistrate Juba was aware of the potential conflicts and made inquiries at the initial appearances in January and March of 1978.[11] The Magistrate accepted Allen's purported waiver of any conflicts. We assume for the moment that the Magistrate properly discharged his duty of inquiry under *Glasser, Holloway,* and *Sullivan.* The question remains whether the judges who subsequently presided over pretrial matters had an independent duty to inquire.[12]

As of May 11, 1978, the district court had received the culpability list and therefore knew not only of the group plea negotiations, but that defense counsel had ranked the defendants by their relative culpability. This new list was extraordinary and presented glaring issues of conflict that were not apparent at the arraignment. At this point the court "knew or reasonably should know" that a serious conflict existed. Even assuming that defendants had earlier waived their right to fully independent counsel, this new list triggered the

11. *See infra* note 13.

12. The Commentary to Federal Rule of Criminal Procedure 44(c), effective December 1, 1980, indicates that the court's duty of inquiry in joint representation cases is a continuing one:

[T]he mere fact that a rule 44(c) inquiry was conducted in the early stages of the case does not relieve the court of all responsibility in this regard thereafter. The obligation placed upon the court by rule 44(c) is a continuing one, and thus in a particular case further inquiry may be necessary on a later occasion because of new developments suggesting a potential conflict of interest.

court's duty to inquire, to advise defendants of the serious conflict inherent in the submittal of such a list, and to provide defendants a further opportunity to seek new counsel or effect a new waiver. The court did not discharge this duty.

*Were the Conflicts "Actual"?*

1. The Allen/Charles Minnig Conflict

■ The parties dispute whether the facts of this case give rise to an "actual conflict." Allen argues that by representing both Allen and Charles Minnig in plea bargaining, where Allen's role was inflated and Minnig's role was deflated, no attorney could fully pursue his obligation to one client without jeopardizing the interests of the other. *See Zuck v. Alabama*, 588 F.2d 436, 439 (5th Cir.) (actual conflict exists if a defense attorney owes duties to a party whose interests are adverse to those of the defendant), *cert. denied*, 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979). The government cites us to our requirement in *Willis v. United States*, 614 F.2d 1200 (9th Cir. 1980), of "a factual showing on the record that a conflict existed." *Id.* at 1203.

By definition, a culpability list such as the one propounded in this case plays one defendant against another. The very existence of this list, which placed Allen at odds with co-defendants who were in fact more culpable, is sufficient evidence of an "actual conflict." It bears repeating that Allen need not show prejudice resulting from this list, only that there was an actual conflict that adversely affected counsel's performance. *See Sullivan, supra,* 466 U.S. at 349–50, 100 S.Ct. at 1718–19.

2. The Allen/Unindicted Bosses Conflict

Oteri and Weinberg admit that they had an ongoing attorney-client relationship with Timothy Minnig and Robert Frappier, the then-unindicted bosses of the operation. Moreover, the testimony gives rise to but one reasonable inference: these unindicted bosses were bankrolling the defense of Allen and his sixteen co-defendants. We are thus presented with a situation reminiscent of *Wood v. Georgia*, 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981).

In *Wood*, defendants' attorney was retained by their former employer, who was the operator of the criminal enterprise. The attorney may have been representing the interests of the employer, and there was a "clear possibility of conflict of interest." *Id.* at 267, 101 S.Ct. at 1101. The Court found such facts sufficient to trigger a *Sullivan* inquiry, and remanded the case to the trial court. *Id.* at 273, 101 S.Ct. at 1104. The Supreme Court noted

> the inherent dangers that arise when a criminal defendant is represented by a lawyer hired and paid by a third party, particularly when the third party is the operator of the alleged criminal enterprise. One risk is that the lawyer will prevent his client from obtaining leniency by preventing the client from offering testimony against his former employer or from taking other actions contrary to the employer's interest.

*Id.* at 268–69, 101 S.Ct. at 1102 (footnotes omitted). The *Wood* Court went on to acknowledge the analysis of a New Jersey court:

> A conflict of interest inheres in every such situation.... It is inherently wrong to represent both the employer and the employee if the employee's interest may, and the public interest will, be advanced by the employee's disclosure of his employer's criminal conduct. For the same reasons, it is also inherently wrong for an attorney who represents only the employee to accept a promise to pay from one whose criminal liability may turn on the employee's testimony.

*Id.* at 269 n. 15, 101 S.Ct. at 1102 n. 15, quoting *In re Abrams*, 56 N.J. 271, 276, 266 A.2d 275, 278 (1970).

It is apparent that any genuine effort by Allen or his lawyers to portray accurately Allen's involvement and refute the false impression of the Government, the probation office, and the court that he was a principal, would have implicated not only co-defendant Charles Minnig, but the unindicted bosses themselves. Under such circumstances the same lawyer could not effectively represent all these clients. This

predicament gave rise to an actual conflict of interest.

### Did the Conflicts Adversely Affect Counsels' Performance?

The focus of the "adversely affected" inquiry was suggested by the *Holloway* Court and adopted by the *Sullivan* Court. "[I]n a case of joint representation of conflicting interests the evil—it bears repeating—is in what the advocate finds himself compelled to *refrain* from doing, not only at trial but *also as to pretrial plea negotiations* and in the sentencing process." *Holloway*, 435 U.S. at 490, 98 S.Ct. at 1181 (emphasis in original and added). Again, the question is not whether the client was prejudiced. "[T]o assess the impact of a conflict of interests on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible." *Id.* at 491, 98 S.Ct. at 1182.

#### 1. The Allen/Charles Minnig Conflict

■ Due to the actual conflicts of interest inherent in their joint representation of Allen and Charles Minnig, Oteri and Weinberg held Allen out as a principal, refraining from disclosing Allen's or Charles Minnig's true culpability. The adverse effect on Allen's representation is apparent. Put another way, "[n]o one should be represented by an attorney who is making him the 'fall guy' by design." *United States v. De Berry*, 487 F.2d 448, 454 (2nd Cir.1973).

#### 2. The Allen/Unindicted Bosses Conflict

Even when the extent of conflicts is known, it is "virtually impossible" to assess the effect on the proceedings. *Holloway, supra,* 435 U.S. at 491, 98 S.Ct. at 1182. When the conflicts are undisclosed, a defendant such as Allen will be unable to comply literally with the "adversely affected" prong of *Sullivan.*

The *Sullivan* Court noted that defense counsel have an ethical obligation to advise the court promptly of any potential conflict. Absent special circumstances, a court may assume that no conflict inheres in the multiple representation or that the client and lawyer accept the risk. 446 U.S. at 346–47, 100 S.Ct. at 1717. Here, however, the conflict between Allen and the unindicted bosses was undisclosed to the court, and Oteri and Weinberg maintain that they were not at liberty to make any such disclosure absent a waiver by Timothy Minnig and Robert Frappier of their own attorney-client privileges. In these § 2255 proceedings both Oteri and Weinberg invoked the privilege and declined to state whether they knew that either Timothy Minnig or Frappier was involved in the smuggling operation. Oteri further declined to say whether he communicated with either of them during the litigation, although Weinberg "wouldn't exclude the possibility" that he had talked to Frappier about the case. Indeed, certain unnamed clients "expressed an interest in the case." Nevertheless, Weinberg testified that he "suspected or knew" that he had unindicted clients who were involved in the operation at a higher level than Allen, and that he had since "confirmed" that suspicion or knowledge. Oteri testified that he made no "conscious" decision to protect anyone other than the seventeen defendants.

Allen is thus placed in an impossible position. He cannot know or prove to a reviewing court what his lawyers had learned from their other clients, or how that information caused counsel to act or refrain from acting in certain ways. The *Sullivan* test was not designed to resolve such a conundrum. As in *Holloway*, however, "unguided speculation" is neither necessary nor appropriate here. 435 U.S. at 491, 62 S.Ct. at 1182. The right to a counselor of undivided loyalties is "too fundamental and absolute," *Glasser, supra,* 315 U.S. at 76, 62 S.Ct. at 467, the actual conflict in this case too glaring, and the nondisclosure of the conflict too significant, to require any further evidence that Allen's representation was adversely affected.

### Did Allen Knowingly and Intelligently Waive His Right To Different Counsel?

A central issue on this appeal is whether Allen knowingly and intelligently waived these conflicts. The government contends, and the district court found, that Allen effected such a waiver.

Courts "indulge every reasonable presumption against the waiver of fundamental rights." *Glasser, supra,* 315 U.S. at 70, 62 S.Ct. at 464. The burden of proving waiver is on the government. *Barker v. Wingo,* 407 U.S. 514, 529, 92 S.Ct. 2182, 2191, 33 L.Ed.2d 101 (1972). "[W]aivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Edwards v. Arizona,* 451 U.S. 477, 482, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981) (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)).

The possible instances of waiver include Allen's statements in open court before Magistrate Juba in early 1978, and the waiver letter and affidavit signed by Allen soon thereafter. The government urges us to review these instances in light of the following undisputed facts: Allen is highly educated and intelligent, had known Timothy Minnig for several years before the arrest, knew that Oteri had represented Minnig in the past, and knew that Minnig had instructed him to contact Oteri & Weinberg if the operation went awry.

At the initial court appearances, Allen argues, Magistrate Juba's own statements made it practically impossible for Allen to make an intelligent waiver. The Magistrate praised the integrity of the lawyers, pressured the defendants to make a quick decision, and led them to believe their initial decision would be binding. The transcript lends some support to this argument.[13] *See United States v. Curio,* 680

13. The following discussion transpired on January 6, 1978 (emphasis added):

THE COURT: I suppose this is the right moment to talk about who ultimately—if all these cases go to trial, whether or not these three lawyers are going to represent all seventeen defendants. It appears almost impossible for seventeen defendants in a group such as this, there would almost have to be some form of conflict. There is developing case law on the subject. The Court has to be very concerned and I'm sure Counsel is concerned. *I know Mr. Sepenuk very well. I don't know Mr. Oteri and Mr. Lawson except through the last day or so, but I have no reason to believe they are anything but as honorable as Mr. Sepenuk. I know Mr. Sepenuk has never for one minute permitted himself to get into a situation where he would represent clients who have conflicting interest. And, the defendants, of course, should be well aware of it.* I suspect possibly the lawyers have already discussed this with you. But this might be different from others, the classic type of conflict where two people are tried with a crime and one says: "He did it." The other would say, "No, he did it." Obviously one lawyer couldn't represent those two people. It's possible that some of you, assuming for the moment that you did proceed to trial, are more culpable than others; those circumstances might be difficult for a lawyer to represent both people because at the time of sentence, you would have to stand up and say, "This man is really one of the fellows who engineered the scheme. This fellow only drove a truck and helped unload. So, this fellow is subject to a bigger sentence since his involvement is so much higher or less." Those are the things we have to think about, whether or not all seventeen can be represented by one group of counsel.

Do you have any comment, Mr. Oteri?

MR. OTERI: I would merely point out, Your Honor, it chills me enough to scare me off, *I have no intention, whether there is or is not a conflict, of representing this whole group.* If in fact I stay in the case, I will suggest local counsel be obtained to supplement the wonderful assistance we are getting from Norm [Sepenuk].

At the arraignment on March 7, 1978, the following colloquy occurred (emphasis added):

THE COURT: As to all Defendants other than Maggiacomo and Kolander, I wanted to talk about your representation and possible conflict of interest. I'm going to read this to you:

It is my duty to inform each of you that you have the right to be represented by a separate attorney. Although you may insist on being jointly represented by a single or two or more attorneys. Joint representation involves a risk of creating conflicts of interest on the part of your attorney which can result in harm and prejudice in the defense of the charges against you.

For example, the existence of a conflict of interest as a result of joint representation may affect which witnesses are called to your defense, whether you take the stand on your own behalf, what questions are asked on cross-examination, what arguments are made, whether a trial before a jury is had, and, if so, what jury instructions are requested.

In short, an attorney has a duty of loyalty to each of his clients. When one attorney represents two clients in the same case, this duty of loyalty is easily breached. What may be in the best interest of one defendant may not be in the best interest of the other.

You each have the right to be represented by your own separate attorney whose duty of loyalty will be owed to you exclusively. If you cannot afford your own attorney, the Court will appoint one for you.

Now I'm going to ask three questions and I'm going to direct them to you collectively. But I'm going to ask each of you to respond to them.

First, have you discussed the risks involved in joint representation with your attorneys in detail, Mr. Allen?

\* \* \* \* \*

Are you aware of any actual or potential conflicts of interests that could arise in this case; yes or no, Mr. Allen?

DEFENDANT ALLEN: Not at this time, sir, no.

THE COURT: The thing is, you are saying "not at this time." I have just set the trial to commence on May 8th. If there is a potential of a conflict of interest, we don't want that trial to have to be reset because one or more of you come forward in the future and say, "I have discovered a conflict and these attorneys can't represent me." I have already been given a copy of a letter that's been sent to you by the lawyers, Mr. Oteri, Mr. Weinberg, Mr. Lawson and Mr. Sepenuk, talking about conflicts of interest. They also have prepared a form of written waiver. In addition to that, I have got my own form of written waiver that I'm going to require each of you to sign in the event you proceed in this action, *which means you are going to waive any problem due to conflicts that may arise in the future. It is important we settle this once and for all, preferably today, if not today, this week as to whether or not you are going to proceed with these lawyers as a group. You're not going to be permitted to come in at a later date and say, "I discovered a conflict; therefore, I can't go to trial."* I suspect that is exactly what is going to happen if all of you proceed with this one group of lawyers. I will continue the questions and talk about that some more.

\* \* \* \* \*

Do you wish to waive your right to separate counsel, Mr. Allen?

DEFENDANT ASLEN: For the time being, yes.

THE COURT: I'm not going to take that for an answer. Do you wish to waive your right to separate counsel? Are you unprepared to answer that?

DEFENDANT ALLEN: *I am unprepared to answer that.*

THE COURT: You can appear tomorrow morning at 9:00 o'clock. We will address the matter at that time.

\* \* \* \* \*

MR. OTERI: Your Honor, may I address the Court on behalf of Mr. Allen.

THE COURT: Yes. At this point, I'm going through the entire process with the Defendants.

MR. OTERI: Your Honor, in addressing the Court ourselves to the situation as it exists, *we see no conflicts of interest.* The Defendants at this point are going to be represented by the group of lawyers and are satisfied. I think it is unfair to them, Your Honor, to ask them to say to you on the record, "We waive our rights to separate counsel." *If after discovery, Your Honor, something comes up you have not addressed yourself to nor have we addressed ourselves to, I think it is unfair to have them waive that right now. After discovery, if you will note in the letter we have written, Your Honor, we make the discovery as the cutoff.* I can say to you very frankly I have no intention, I don't see any possible way that my firm can represent the number of Defendants we have here. After we have the motions at a trial, but until I get some kind of concrete basis to make that decision, I don't think these men should be put in a position of waiving their rights to later say, "We want or need another counsel." I can understand the Court's position. I'm sympathetic to it. I tell you, based on my experience, we have no intention of playing delay games by changing counsel at the last minutes to delay cases. Once we have our motion hearing or our discovery is provided, we intend to sit down as a group and make a decision as to who needs another counsel and make arrangements.

THE COURT: That should have been done prior to the day, Mr. Oteri.

MR. OTERI: It can't be, based on what we haven't got. We haven't enough basis. Based on what we know, we don't know as much as we can know. We can't make that decision without some kind of discovery and some kind of hearing on motions, Your Honor.

THE COURT: I'm going to ask the question.

\* \* \* \* \*

THE COURT: This letter is dated March 2nd, 1978. I assume it was addressed to each of you signed by Mr. Oteri, Mr. Weinberg, Mr. Lawson and Mr. Sepunuk. Are there any of you who did not get a copy of this letter? If so, stand up. No one stood up. Everyone has a copy of the letter.

Have all of you read it? If there is someone who hasn't read it, stand up. No one stood up.

Do all of you understand the contents of that letter? If not, stand up? No one stood up.

Again, as I said, I am setting this trial to start on May 6th. It is going to probably be a long trial. Counsel have to have ample time to prepare for the trial. *If you wish to switch lawyers shortly before that trial, that is your decision. And, your lawyer is going to be handicapped.* If he is handicapped, possibly by the length of time to prepare for the trial, I want all of you to understand that. I fully expect some of you are going to be coming in saying, "I want to have a separate lawyer." I want you to be on notice now, that if you change lawyers, you're going to be told that lawyer has to be ready for trial on May 6th.

F.2d 881, 890 (2d Cir.1982) (trial court should "allow a reasonable time for the defendant to make his decision [because without such time] both the opportunity for the defendant to make a knowing and intelligent decision and the opportunity for the court to assess correctly whether such a decision has been made are minimized").

■ More importantly, however, Allen's and Oteri's statements to the Magistrate, read in conjunction with the waiver letter and affidavit, give little reason to believe that Allen was adequately informed of the significance of the conflict. We do not require that a defendant predict that particular dilemmas will present themselves, *United States v. Curio*, 680 F.2d 881, 888 (2d Cir.1982), but we do require that a defendant know about all of the risks that are likely to develop, *see, e.g., United States v. Agosto*, 675 F.2d 965, 976–77 (8th Cir.) (waiver ineffective where defendant informed of possible conflict due to attorney's prior representation of codefendant and told that conflict may arise from prior confidential communications but not told that conflict may arise from attorney's continued loyalty to codefendant), *cert. denied*, 459 U.S. 834, 103 S.Ct. 77, 74 L.Ed.2d 74 (1982); *see also United States v. Partin*, 601 F.2d 1000, 1008 (9th Cir.1979) ("If the conflict of interest problem which [the defendant] raises on appeal had been a completely unknown contingency prior to his trial, we might be reluctant to find waiver of his right to counsel free from conflict of interest.... To do so might force a defendant to waive his right to object to unknown problems at his trial."),

*cert. denied*, 446 U.S. 964, 100 S.Ct. 2939, 64 L.Ed.2d 822 (1980), or at least know that risks impossible to foretell may arise.

We find nothing in the record that would establish that Allen was told of the risks of joint plea bargaining or submitting a culpability list. Although Magistrate Juba stated generally that there was a danger in joint representation and listed certain trial decisions that could be affected by a conflict, he did not describe the impact that a conflict might have on pretrial proceedings. He did, however, refer to conflicts that might arise at sentencing because of differences in culpability. Upon the Magistrate's inquiries about waiver, Allen twice gave equivocal answers and then flatly declined to waive unconditionally his right to independent counsel. At this point Oteri spoke with Allen, and Allen subsequently told the Magistrate that he knew "all of the possible consequences" and waived his right to separate counsel. What Oteri told Allen was not disclosed. The Magistrate should not have left unexamined Allen's declaration, and we cannot presume that the defect was cured. Further, the only potential conflict mentioned in the waiver letter drafted by Oteri is that which might develop if any defendant wished to cooperate with the government. There is no mention of the conflict inherent in group plea bargaining, the particular risks of a culpability list, or the firm's ongoing obligations to Timothy Minnig and Robert Frappier. The letter advised Allen that "prior to the resolution of the pre-trial matters, we see no conflict of interest inherent except as enumerated above." [14] Indeed, Oteri testified

---

That lawyer will probably be complaining, "I don't have time to prepare. I just came into the case." When you do this, tell him what I said, he is going to have to work night and day, weekends to prepare, because the trial will go at that time. *You have all made this choice. You have made it knowingly. And, you're not going to get any sympathy when it comes.*

\* \* \* \* \*

MR. OTERI: Your Honor, for the record, Mr. Allen would like to inquire as to the right to have other counsel. He has changed his mind. You had ordered a hearing for tomorrow morning. He would like to clarify that on the record.

THE COURT: Mr. Allen, you were unable to answer the question as to whether or not you were waiving your right to separate counsel. Do you want to say something in that regard now?

DEFENDANT ALLEN: Yes, I would waive my right to separate counsel.

THE COURT: You know all the possible consequences?

DEFENDANT ALLEN: Yes, sir.

THE COURT: Very well, Your right to separate counsel is waived."

14. The letter was dated March 5, 1978, and signed by Oteri, Weinberg, Lawson, and Sepenuk. It stated:

that he told the defendants that he "didn't see any real conflict up until the time of trial; up to the motion stage at least there would be no possibility of a conflict." At

Pursuant to our obligations under the Code of Ethics of the American Bar Association and pursuant to your right to effective representation by independent counsel, we author this letter jointly in order to advise you regarding the relationship between our joint representation of you and any potential conflict of interest. First, we wish to formally inform each of you that we presently represent [the seventeen co-defendants] in Criminal Number 78–45 in the United States District Court for the District of Oregon, Coos County, Oregon.

We are obligated to inform you that attorneys should not represent multiple clients in litigation where these clients have differing interests. Further, that even in cases where there is no apparent incongruent interest between the jointly represented clients, we have an obligation which we satisfy by means of this correspondence, to notify you (a) that you have an absolute right to obtain separate counsel; (b) that we will not continue to represent you unless you consent by signing the appropriate place at the end of this communication; (c) that we recommend that you carefully evaluate whether or not you wish to obtain separate counsel; (d) that all litigation involves strategic and tactical decisions which counsel must make; that independent of who pays how much of our fee, to the best of our conscious abilities, we intend to give everyone whom we represent undivided loyalty so long as their interests are not inherently diverse; that we are presently at a pre-trial stage in the litigation involving the above-mentioned criminal indictment; that the issues at the pre-trial stage are not guilt or innocence, but are legal issues in your case revolving around potential illegal assets, searches and seizures and other defects in the investigation and institution of the above-mentioned indictment; that there is no inherent divergence of interest regarding the litigation of these legal matters; that we intend to explain to you every decision we make, tactical or strategic, regarding the preparation and litigation of all pre-trial matters including that of standing to object to the arrests, searches and seizures of various persons and places which we have already discussed in some detail with you; that an inherent divergence of interest occurs if anyone, whom we presently represent, wishes to cooperate with the United States Attorney's Office against any of the others; that we have informed you (and all of the other defendants whom we presently represent) orally and we, by means of this communication, inform you formally in writing that anyone whom we presently represent may, perhaps, make an excellent self-serving negotiated plea bargain with the United States Attorney's Office for cooperation and/or testimony; that you should carefully consider both the benefits

the arraignment on March 7, 1978, he told the court: "We see no conflict of interest." The form affidavit signed by each defendant was perfunctory and suffered from the same infirmity as the waiver letter.[15]

and the disadvantages to negotiating a plea bargain with the government which involves cooperation, but that the most prominent advantage which you should be formally aware of is the possibility of being able to obtain, from the United States Attorney's Office, a promise of a non-custodial sentence or even perhaps a dismissal of charges; that if you, or anyone else whom we presently represent, intends to cooperate or wishes to commence negotiations for purposes of cooperation, then please do not sign the appropriate place at the end of this correspondence for you would be best served by obtaining independent counsel to effectuate that intention; if you wish to cooperate you may either inform us and we will be bound by the attorney-client privilege not to reveal that information to any of our other clients or select any other counsel and have him attempt to negotiate a plea bargain or inform the court directly that you wish to cooperate and wish counsel appointed for you for the purpose of negotiating a settlement with the government; (e) that at the conclusion of pre-trial matters, we will again communicate to you in a formal manner pursuant to our obligations and will once again independently analyze whether or not there are any inherent diversions of interest. We believe at this time, that if there is a trial, other attorneys may be necessary; the decision as to whether or not there exists a divergence of interests then must be made by careful consideration of your own position and by our mutual and careful evaluation as to whether or not any conflict of interest exists.

At this point, prior to the resolution of pre-trial matters, we see no conflict of interest inherent in your position except as enumerated above. You are free to either request independent counsel and your failure to sign the bottom of this letter after your careful consideration will notate that desire to us or to waive your right to independent counsel and to accept our joint representation as being in your own best interest. If you intend to waive your right to separate counsel, please sign the bottom of this letter. This waiver can always be revoked by you if you should change your mind.

**15.** Each sworn affidavit stated:

1. That I am one of the 17 co-defendants in this case;

2. That I wish to be represented by the law firm of Oteri & Weinberg;

3. That I know that my co-defendants also wish to be represented by the law firm of Oteri & Weinberg;

4. That I have thoroughly discussed, with representatives of Oteri & Weinberg, the possi-

While there were substantial efforts to alert Allen to possibilities of conflicts by the Magistrate and counsel, there was no forthright discussion of the effect of the culpability list and of joint representation of the unindicted bosses. In sum, it does not appear that Allen was properly advised of the gross conflicts underlying this joint representation. The evidence suggests, rather, that Allen may have been misled by his attorneys. Despite Allen's obvious intelligence, and his knowledge that Timothy Minnig continued to repose some confidence in Oteri & Weinberg, there is no direct evidence that Allen understood the exigencies of the imminent joint plea bargaining, the nature of Oteri & Weinberg's obligations to Minnig and Frappier, and the ramifications of all this for his liability. Were we confident that Allen had been candidly and fully advised of those aspects by counsel or by the court, we might find a knowing and intelligent waiver. On these facts we cannot.[16]

The remaining question is whether, despite the lack of a knowing and intelligent waiver, Cullen and Topel provided sufficiently independent and effective counsel at trial and sentencing to render the pre-trial conflicts immaterial.

*Representation By Cullen and Topel*

The government argues, and the district court found, that Cullen gave Allen "genuinely independent counsel."

Allen alleges in his § 2255 petition and testified that Cullen repeatedly prevented him from cooperating with the government or in any way incriminating the principals. Cullen, on the other hand, testified that he told Allen at their very first meeting, and several times thereafter, of the benefits of cooperation. He even told the prosecutor that Allen was in the wrong category, and asked how Allen might deal. Allen was not responsive, as he was not willing to reveal that Charles Minnig was the boss. According to Cullen, Allen made a "knowing and intelligent decision" not to implicate Charles Minnig. Allen told Topel that Cullen had suggested cooperation, and Topel confirmed that Allen was "totally opposed" to giving names. Oteri and Weinberg also testified that Allen frequently complained to them that Cullen was pressuring him to cooperate.

Cullen also recalls "fully discussing" the culpability list with Allen before it was published, including how to lower Allen's ranking by exposing the true role of Charles Minnig. Allen was adamantly opposed to such a course. Cullen testified that although Allen was not happy with his ranking, Allen thought that serving six months was "not bad" because he was going to end up owning the beachfront ranch. Topel offered the same general description of Allen's attitude.

Magistrate Hogan concluded that the "resolution of this case is essentially one of credibility." The Magistrate assumed *arguendo* that Allen was under pressure to remain silent, but found that Allen nevertheless

> received genuinely independent counsel from Mr. Cullen.... Cullen impressed

---

bility of a conflict of interest arising from joint representation and have informed them of any facts within my knowledge that might give rise to any conflict of interest;

5. That as a result of these discussions, I have been informed by Oteri & Weinberg that there is no apparent conflict of interest at this time;

6. That I have been informed by Oteri & Weinberg that I have an absolute right to separate counsel and I understand that I have an absolute right to either retain separate counsel of my choice, or, if I am unable to afford counsel, to have separate counsel appointed for me by the court;

7. That after thorough discussion of the factual and legal issues involved in this case with representatives of Oteri & Weinberg, I see no factual or legal issues that will give rise to any conflict of interest;

8. That I recognize that I have a continuing duty to disclose any conflict or potential conflict of interest to Oteri & Weinberg as soon as it arises;

9. That I realize that if a conflict of interest arises, Oteri & Weinberg cannot continue to represent both me and my co-defendants in this case.

16. As noted *supra*, even had there been a valid waiver at the arraignment stage, the court's duty of inquiry again was triggered upon submittal of the culpability list. Moreover, Oteri assured the Magistrate and the defendants that he would exercise continuing vigilence. It is evident that he did not.

me as a highly credible witness, and I find that he did discuss the possibility of cooperation with petitioner, and that petitioner adamantly rejected this alternative. Petitioner was apparently more interested in complete exoneration than turning evidence against his fellow defendants. I find that Cullen provided adequate representation to petitioner while serving as his counsel and that Cullen's independent judgment was not tainted by the alleged intimidation and alleged conflict of interest in the joint defense.

The Magistrate concluded:

I am not completely satisfied that petitioner's story of pressure to remain silent is fabricated, but I find, in the context of Cullen's and Topel's representation and in the context of petitioner's determination not to cooperate, that the pressure inside the defense lines did not taint petitioner's constitutional right to counsel or to a jury trial.

Judge Burns affirmed and adopted Magistrate Hogan's findings and recommendations.

The district court's finding that Cullen repeatedly suggested to Allen that he cooperate and reduce his liability, and that Allen adamantly refused, is amply supported by the testimony and is not clearly erroneous. There is no other indication that Cullen's and Topel's representation of Allen at trial and sentencing was anything but independent, vigorous and effective.

In this case, Allen has already received the only meaningful remedy to which he is entitled—effective assistance from an independent counsel at a trial before a different judge. We are not faced here, for example, with a request to enforce a plea bargain withdrawn by the Government in bad faith. Prejudice to Allen, if any, came from ineffective assistance of his own counsel.

Thus, although we are deeply troubled by Oteri & Weinberg's pre-trial conduct, and by the potential for such conduct to infect and invalidate the entire proceeding, on this record we must uphold the trial court.

The judgment denying Allen's § 2255 petition is AFFIRMED.